UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

YAHAIRA MACA SALGADO,                          :
                                               :
                        Plaintiff,             :
                                               :
            v.                                 :          3:23-CV-01233 (SFR)
                                               :
UNITED STATES LIABILITY INSURANCE              :
COMPANY,                                       :
                                               :
                        Defendant.             x

----------------------------------------------------------------

**MEMORANDUM & ORDER**

Yahaira Maca Salgado ("Salgado") has brought this action against United States Liability Insurance Company ("USLI") pursuant to Connecticut General Statutes § 38a-321, which allows a plaintiff holding a judgment against an insured to recover directly from the insurance company where the company has breached its duty to defend the insured in underlying litigation. Following her injury at a Cinco de Mayo celebration, Salgado obtained a judgment in Connecticut Superior Court against various individuals, including Rodrigo Rodriguez, an event organizer who had obtained an insurance policy issued by USLI. Compl. 4-6, ECF No. 1-1. Salgado alleges in the present action that USLI breached its duty to defend Rodriguez in the state court action. *Id.* at 6. Following USLI's removal of this action to federal court, the parties filed cross motions for summary judgment. ECF Nos. 45, 52. For the

1

following reasons, USLI's Motion for Summary Judgment is **DENIED** and Salgado's Motion

for Summary Judgment is **GRANTED**.

## I.    <u>BACKGROUND</u>

### A.    **Factual Background**

The following facts are undisputed unless otherwise noted.[1] On May 4, 2019, Yahaira

Maca Salgado was severely injured at a Cinco de Mayo celebration in Willimantic,

Connecticut. Following her injury, Salgado filed a complaint in Connecticut Superior Court

against three individuals who organized the event (Rodrigo Rodriguez, David Meza, and

Abimael Torillo) and a man (Max Sanchez) who the complaint alleges "discharged his muzzle-

loading black powder antique firearm" in Salgado's direction at the event. ECF No. 48-2, at

2-3. The state court complaint asserts that Sanchez's "antique firearm was designed to use, and

indeed did use, black powder" and "was not designed to use, and did not use, fixed

ammunition." *Id.* at 3. According to the complaint, "[b]lack powder from Defendant Sanchez's

antique firearm struck [Salgado], causing injury" including severe burns, profuse bleeding,

scarring/disfigurement, anxiety, and psychological trauma. *Id.* at 3-4. Salgado's injuries were

"directly and proximately caused by the carelessness and negligence of Defendant Sanchez"

in that he: "failed to exercise a reasonable degree of care when holding his firearm"; "failed to

reasonably observe his surroundings and maintain a proper lookout for other people in his

---

[1] The factual background is drawn from facts admitted in Salgado's Local Rule 56(a)2 Statement of Facts submitted in response to USLI's Motion for Summary Judgment, ECF No. 51-1 ("Pl.'s L.R. 56(a)2 St."), facts admitted in USLI's Local Rule 56(a)2 Statement of Facts submitted in response to Salgado's Motion for Summary Judgment, ECF No. 55 ("Def.'s L.R. 56(a)2 St."), and various exhibits attached to these statements. Citations to the Rule 56(a)2 Statements are by paragraph number. With respect to other documents, page citations are to the page number generated by the ECF system.

vicinity"; "failed to warn people around him that he was utilizing an antique firearm loaded with black powder and that powder could cause injury"; and "discharged his black powder antique firearm within close range" of Salgado. *Id.* at 3.

The state court complaint alleges that Rodriguez, Meza, and Torillo "organized and supervised" the "May 4, 2019 Cinco de Mayo parade." *Id.* at 2. The complaint asserts identical claims for negligence against Rodriguez, Meza, and Torillo, stating that Salgado's injuries were directly and proximately caused by their "carelessness and negligence" in that they: "[f]ailed to warn attendees regarding the use of antique firearms in the Cinco de Mayo celebration"; "[f]ailed to ensure those attending the Cinco de Mayo celebration that would be using antique firearms, including Defendant Sanchez, were adequately trained in the use of firearms"; "[f]ailed to warn attendees of the potential danger of antique firearms"; "[f]ailed to ensure those using antique firearms, including Defendant Sanchez, were doing so in a separate space to avoid injury to attendees"; "[f]ailed to post adequate signs or other warnings regarding the use of antique firearms"; and "[a]llowed the unsupervised use of firearms in the midst of the general public, including [Salgado], as part of the event." *Id.* at 4-8.

Prior to the event, USLI issued a Special Event Commercial Liability Policy ("Policy") to Rodriguez as the Named Insured for the Policy Period of May 4, 2019 to May 6, 2019. Pl.'s L.R. 56(a)2 St. ¶ 1, ECF No. 51-1. The Insuring Agreement under Coverage A within the Commercial General Liability Coverage Form provides, in pertinent part, the following:

    1.    Insuring Agreement

        a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the

insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

. . . .

    b.    This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

ECF No. 48-1, at 8. The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 21. The Policy defines "bodily injury" as meaning "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id*. at 20.

The Policy was issued with the endorsement captioned "**EXCLUSION FOR FIREARMS, FIREWORKS AND OTHER PYROTECHNIC DEVICES**", which provides the following:

    A.    This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical expenses including damages for care and loss of services:

        1.    Arising from the ownership, maintenance, operation, sponsorship, set-up or take-down or other use of:

            a.    Firearms, including handguns, revolvers, pistols, rifles, shotguns, air guns, semiautomatic weapons and similar devices;

            b.    Fireworks, including firecrackers, Roman Candles, pinwheels skyrockets, ground displays, flares, smoke bombs and similar devices that produce, when ignited or activated, sound, smoke, motion or a combination of these;

    by any Insured or by any person for which any Insured may be held liable in any capacity.

    B.    This insurance does not apply to any obligation of any Insured to indemnify, defend or contribute jointly or severally with another because of "bodily injury", "property damage", "personal and advertising injury"

4

or medical expenses arising from any of the activities specified in **A.1.**, above.

*Id.* at 52. The Policy was also issued with the endorsement titled "**ASSAULT or BATTERY**

**EXCLUSION**", which states, in relevant part, the following:

> This insurance does not apply to:
>
> Any claim, demand or "suit" based upon any actual or alleged "assault" or "battery", or out of any act or omission in connection with the prevention or suppression of any "assault" or "battery", including the use of reasonable force to protect persons or property, whether caused by or at the instigation or direction of an insured, its "employees", agents, officers or directors, patrons or any other person. Further, no coverage is provided for any claim, demand or "suit" in which the underlying operative facts constitute "assault" or "battery".
>
> This exclusion applies to all "bodily injury", "property damage" or "personal and advertising injury" sustained by any person, including emotional distress and mental anguish, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving "assault" or "battery" whether alleged, threatened or actual. . .
>
> This exclusion supersedes any provision in the attached policy that provides coverage for "bodily injury" arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the use of reasonable force to protect person(s) or property.
>
> "Assault" means the threat of, or use of force on another that causes that person to have apprehension of imminent harmful or offensive conduct, whether or not the threat or use of force is alleged to be negligent, intentional or criminal in nature.
>
> "Battery" means negligent or intentional physical contact with another without consent that results in physical or emotional injury.

*Id.* at 44.

USLI's Rule 56(a)1 Statement states that on or around October 28, 2019, USLI received a letter of representation from Salgado's attorney with a police report from the May 4, 2019 incident. Def.'s L.R. 56(a)1 St. ¶ 19, ECF No. 47. USLI's Rule 56(a)1 Statement quotes from the police report and provides it as an exhibit to its Motion for Summary Judgment. *Id.* ¶¶ 20-

24; ECF No. 48-7. Salgado acknowledges USLI has accurately quoted the letter of representation and the police report but asserts that USLI "cannot rely on such material in this context" because the duty to defend "will exist even if the defendant contends that there are 'facts outside the four corners of [the complaint] indicate that the claim may be meritless or not covered.'" Pl.'s Rule 56(a)2 St. ¶¶ 19-24, ECF No. 51-1 (quoting *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 805 (2013)).

USLI sent correspondence on November 19, 2019 to Salgado's counsel and Rodriguez, declining coverage under the Policy for Salgado's claim. Pl.'s L.R. 56(a)2 St. ¶¶ 25-26. On July 9, 2020, Salgado filed a complaint in Connecticut Superior Court captioned *Yahaira Salgado v. Max Sanchez et al.*, Dkt. No. WWM-CV20-6020091-S. *Id.* ¶ 7. Salgado obtained a judgment in the state court action for $82,131.35 in economic damages and $1,500,000.00 in non-economic damages, for a total judgment of $1,582,131.35. Pl.'s L.R. 56(a)2 St. ¶ 18; ECF No. 48-6, at 2.[2]

### B.    Procedural History

On August 29, 2023, Salgado filed the instant lawsuit in Connecticut Superior Court. On September 20, 2023, Defendant USLI removed this case to this Court. Compl., ECF No. 1. On September 26, 2023, USLI filed an answer to Salgado's complaint. Answer, ECF No. 13. On December 4, 2023, USLI moved for summary judgment. ECF No. 21. On May 3, 2024, this Court granted leave for USLI to amend its answer, Order, ECF No. 24, and USLI filed its

---

[2] The Superior Court entered judgment following a hearing in damages tried to the court after the entry of a Default for Failure to Appear against Sanchez and a Stipulation of Liability by Agreement entered by Rodriguez and the other parade organizers. Pl.'s L.R. 56(a)2 St. ¶¶ 15-17. Salgado acknowledges the accuracy of information about the stipulation but says "the stipulation is not an appropriate reference point for evaluating the defendant's duty to defend." *Id.* ¶¶ 16-17.

amended answer on May 8, 2024. Am. Answer, ECF No. 25. On July 12, 2024, this Court extended the discovery deadline and denied without prejudice USLI's motion for summary judgment. ECF Nos. 35, 36. This case was transferred to me on January 6, 2025. ECF No. 44. On January 9, 2025, USLI filed a Motion for Summary Judgment and supporting Memorandum asserting that this Court can determine based on undisputed facts that USLI had no duty to defend or indemnify. ECF No. 45; ECF No. 46 ("Def.'s Mem."). On February 10, 2025, Salgado filed a Cross-Motion for Summary Judgment asserting that the undisputed facts show that USLI breached its duty to defend. ECF No. 52. Also on February 10, 2025, Salgado filed an Omnibus Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment. ECF No. 51 (Pl.'s Mem.). On March 6, 2025, USLI filed a Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment (Def.'s Opp."). ECF No. 54. On March 20, 2025, Salgado filed a Reply in Support of Plaintiff's Cross-Motion for Summary Judgment (Pl.'s Reply"). ECF No. 57.

## II.  <u>LEGAL STANDARD</u>

The Court will grant a motion for summary judgment only if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The nonmoving

party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'") (quoting *Soto v. Meachum*, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

When deciding a motion for summary judgment, the Court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits,

and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier*, 2007 WL 685181, at *4. In reviewing the record, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the nonmoving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (quoting *Anderson,* 477 U.S. at 249).

"Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." *AFS/IBEX v. AEGIS Managing Agency Ltd.*, 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021). "Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, 'a district court is not required to grant judgment as a matter of law for one side or the other.'" *Id.* (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). Each party's motion will be "examined on its own merits" and in each case "all reasonable inferences must be drawn against the party

9

whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## III.    **DISCUSSION**

### A.    **The Duty to Defend**

Salgado argues that USLI breached its duty to defend Rodriguez in the underlying state case and therefore Salgado can recover directly from USLI pursuant to Connecticut General Statutes § 38a-321. Salgado asserts that an insurance company must defend when an allegation of the complaint falls even possibly within coverage, and USLI breached its duty by declining to defend based on exclusions that were at a minimum ambiguous. Pl.'s Mem. 1-6, ECF No. 51. USLI argues that no such ambiguity existed for either exclusion and therefore the duty to defend was never triggered. Def.'s Mem. 12-18, ECF No. 46.

Connecticut's direct action statute, Conn. Gen. Stat. § 38a-321, "places the plaintiff in the shoes of the insured, subject to all the same rights and protections as the insured." *Nash St., LLC v. Main St. Am. Assurance Co.*, 337 Conn. 1, 8 (2020). Where "an insurer is guilty of a breach of its contract to defend, it is liable to pay to the insured not only his reasonable expenses in conducting his own defense but, in the absence of fraud or collusion, the amount of a judgment [or settlement] obtained against the insured up to the limit of liability fixed by its policy." *R.T. Vanderbilt Co., Inc. v. Cont'l Cas. Co.*, 273 Conn. 448, 470-71 (2005) (internal quotation marks omitted, alteration in original).

"[T]he duty to defend is broader than the duty to indemnify." *Nash St., LLC*, 337 Conn. at 9 (internal quotation marks omitted). "'An insurer's duty to defend is triggered if at least one allegation of the complaint falls even possibly within the coverage.'" *Id.* (quoting *Travelers Cas. & Sur. Co. of Am. v. Netherlands Ins. Co.*, 312 Conn. 714, 739 (2014)); *see*

*also Nash St., LLC*, 337 Conn. at 9 (stating that "the duty to defend is triggered whenever a complaint alleges facts that potentially could fall within the scope of coverage") (internal quotation marks omitted). "Because all that is necessary to trigger an insurer's duty to defend is a possibility of coverage, any uncertainty as to whether an alleged injury is covered works in favor of providing a defense to an insured, and uncertainty may be either factual or legal." *Nash St., LLC*, 337 Conn. at 10.

Legal uncertainly can arise through "ambiguous policy language" or uncertainly about whether "the cases governing the insurance policy [will] be read to impose coverage in a given situation." *Id.* at 11 (internal quotation marks omitted, alteration in original). "That is, when there is a split of authority in other jurisdictions as to the meaning of a particular policy provision, and no appellate authority in the relevant jurisdiction has opined on the matter, the uncertainty as to how a court might interpret the policy gives rise to the duty to defend." *Id.*

When assessing whether an insurance company breached its duty to defend by declining to defend based on exclusions in a policy, the task is not to determine whether the exclusions "*actually* preclude coverage" or to "determine conclusively what those exclusions mean." *Id.* at 16. Rather, the court looks to whether there was "any *possibility* of coverage" at the time of the tendering of the defense. *Id.*

In assessing whether there was a possibility of coverage, the court must consider Connecticut's "precedent favoring a narrow interpretation of insurance policy exclusions" and rule that ambiguous policy terms must be construed in favor of the insured. *Id.* at 19-20; *Nationwide Mut. Ins. Co. v. Pasiak*, 327 Conn. 225, 239 (2017) (stating that under Connecticut law, when "construing exclusion clauses, the language should be construed in favor of the insured unless [the court] has a high degree of certainty that the policy language clearly and

unambiguously excludes the claim") (internal quotation marks omitted). In addition, "it is a basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters." *Ceci v. National Indem. Co.*, 225 Conn. 165, 173 (1993) (citations and internal quotation marks omitted). Thus, courts construe policies "from the perspective of a reasonable layperson in the position of the purchaser of the policy." *Id.* at 168; *see also Allstate Ins. Co. v. Tenn*, 342 Conn. 292, 299 (2022) (stating "we are mindful of the principle that provisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view") (internal quotation marks omitted).

In assessing whether an insurance company has breached the duty to defend, courts look at the allegations in the underlying complaint. The Connecticut Supreme Court has repeatedly explained that under the "well established 'four corners' doctrine," a "liability insurer has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered." *Travelers Cas. & Sur. Co. of Am.*, 312 Conn. at 739 (internal quotation marks omitted); *see also Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 805 (2013) (same). Thus, "the duty to defend is triggered whenever a complaint alleges facts that potentially could fall within the scope of coverage." *Travelers Cas. & Sur. Co. of Am.*, 312 Conn. at 739 (internal quotation marks omitted).

Both parties cite to facts outside the underlying state court complaint in their briefs. Def.'s Mem. 12 n.1; Pl.'s Mem. 12. At oral argument and in briefing, Salgado's counsel

acknowledged the "four corners" doctrine but observed that an insurers' actual knowledge of facts *establishing* coverage can trigger the duty to defend. *See* Pl.'s Mem. 12 n.5; *see also Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co*., 274 Conn. 457, 467 (2005) ("We agree with the New York Court of Appeals that we should not employ a wooden application of the four corners of the complaint rule [that] would render the duty to defend narrower than the duty to indemnify and that the sounder approach is to require the insurer to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage.") (internal quotation marks omitted, alteration in original). At oral argument, counsel for USLI maintained that it can decline to defend even where a complaint suggests the possibility of coverage if it has knowledge of facts outside of the complaint regarding the incident that establish there is no coverage. However, USLI was not able to provide any case law support for this proposition, which is at odds with the Connecticut Supreme Court's clear statements to the contrary. *See Travelers Cas. & Sur. Co. of Am.*, 312 Conn. at 739.

### B.    Firearms Exclusion

USLI asserts that it was under no obligation to defend Rodriguez in the underlying state court case because the Policy's Firearm Exclusion clearly excluded coverage. The Firearm Exclusion contains two sections. Section A excludes coverage for injuries arising from certain activities relating to firearms "by any Insured or by any person for which any Insured may be held liable in any capacity." ECF No. 48-1, at 52. Section B provides that the "insurance does not apply to any obligation of any Insured to indemnify, defend or contribute jointly or severally with another because of 'bodily injury', 'property damage', 'personal and advertising

injury' or medical expenses arising from any of the activities specified in **A.1.**, above." *Id.* at 52.

### 1.    Section A versus Section B

In its briefing, USLI asserted that coverage was excluded under Section B of the Firearm Exclusion. USLI's memorandum states that Section B excludes coverage because Salgado's underlying complaint "sought to hold [Sanchez, Rodriguez, Meza, and Torillo] joint and severally liable for Plaintiff's injuries." Def.'s Mem. 11. Therefore, the memorandum asserts, "Section B. of the Firearms Exclusion operates to preclude coverage for the entire Underlying Suit, regardless of which defendant was and was not an insured under the Policy." *Id.* At oral argument, counsel for USLI initially stated USLI was not claiming Section A applied but rather was relying on B. However, after I observed that the state court complaint did not in fact seek to hold Rodriguez jointly and severally liable for the actions of Sanchez because joint and several liability has been abolished for such negligence cases in Connecticut,[3] counsel for USLI shifted to reliance on A.[4]

In particular, at argument, USLI sought to rely on Section A on the ground that Sanchez engaged in firearm activities that caused injuries and Sanchez is a "person for which any

---

[3] *See Lostritto v. Cmty. Action Agency of New Haven, Inc*., 269 Conn. 10, 23, 848 A.2d 418, 426 (2004) (explaining that with legislation enacted in 1986 and 1995 the "legislature abolished the common-law rule of joint and several liability" and replaced it with "the current statutory right to apportion liability").

[4] In *Parchman*, the court rejected the plaintiff's argument that because Indiana law had replaced joint and several liability with a comparative fault law "it would contravene public policy to apply the concept through an insurance policy." *Parchman*, 2013 WL 2600406, at *3. The court reasoned: "The policy reads 'jointly or severally,' and does not suggest that the exclusion applies only in cases where 'joint and several' liability is still the reigning standard." *Id.* Here, as noted, USLI's argument that Section B applied was based on its erroneous assertion that the state law

Insured may be held liable in any capacity." Salgado maintained at oral argument that the reach of Section A to the allegations in the complaint was unclear and thus a refusal by USLI to defend based on this provision constituted a breach.

I agree that Section A of the Firearms Exclusion arguably does not apply to the conduct alleged in the complaint. Although USLI maintained at oral argument that Section A of the Exclusion applies because Rodriguez could be held liable for the activities of Sanchez, USLI asserted a contrary view of the identical provision in *U.S. Liab. Ins. Co. v. Parchman*, No. 1:11-cv-01244-TWP-DML, 2013 WL 2600406 (S.D. Ind.), a case USLI cites in its memorandum in the present case. Def.'s Mem. 11. In *Parchman*, a man was killed by a stray bullet as he left a talent show. *Parchman*, 2013 WL 2600406, at *2. The man's estate sued Parchman and other event organizers, asserting, *inter alia*, that the organizers failed to maintain a safe environment for invitees. *Id.* Parchman had bought a policy from USLI that contained an identical firearms exclusion to the provision at issue in the present case. *Id.* at *1-2. In its memorandum in that case, USLI asserted: "Section A. may not apply to Parchman's exposure because the firearms were not used by the insured or any person for which any insured may be held liable in any capacity, i.e. a *respondeat superior* or employer/employee capacity." Pl.'s Mem. 6, *Parchman*, 1:11-cv-01244-TWP-DML (S.D. Ind.), ECF No. 33. The memorandum went on to say: "Arguably, Parchman's exposure, if any, does not arise because

---

complaint "sought to hold [Sanchez, Rodriguez, Meza and Torillo] joint and severally liable for Plaintiff's injuries." Def.'s Mem. 11. USLI has offered no other argument for the application of Section B, instead shifting at oral argument to reliance on Section A. In any event, whether the Policy's phrase "contribute jointly or severally with another" encompasses Connecticut's apportionment system at a minimum raises the kind of legal uncertainty about the application of the Exclusion that triggers the duty to defend.

of his responsibility for the shooter, David Brookins, but rather, from his responsibility to provide Campbell with a safe environment." *Id.* at 6-7. The court in *Parchman* referenced USLI's concession regarding Section A, noting that it was "undisputed that neither Mr. Parchman, nor any employee or agent of Mr. Parchman, used a firearm to cause Mr. Campbell's death." *Parchman*, 2013 WL 2600406, at *3.

Thus, Section A at least arguably applies only where the firearm-related activities were by the insured or an employee or agent of the insured.[5] USLI itself acknowledged the provision could be read that way in *Parchman. Id.* In the present case, there are no allegations in the state court complaint that Sanchez was an agent or employee of Rodriguez. Counsel for USLI has provided no explanation for why a concession was appropriate in *Parchman* and is not appropriate here other than stating that different counsel appeared in *Parchman* for USLI. But the fact that two reasonable lawyers can each read an exclusion in different ways demonstrates the kind of uncertainty that triggers a duty to defend. Accordingly, as the state court complaint does not allege Sanchez was an agent or employee of Rodriguez, Section A at least arguably does not apply to exclude coverage.

### 2. Use of "Firearms"

As noted, USLI abandoned reliance on Section B of the Firearms Exclusion at oral argument. However, even if Rodriguez could be said to have an obligation to "contribute jointly or severally" with Sanchez within the meaning of Section B of the Firearms Exclusion, the exclusion at least arguably does not apply because it is not clear from the face of the state

---

[5] Salgado asserted at oral argument that it was at least ambiguous whether Rodriguez's own actions as an event organizer could be said to constitute "sponsoring" firearms within the meaning of Section A. USLI has not advanced such an argument and the complaint contains no allegation that Rodriguez sponsored firearms.

court complaint that Sanchez's use of a "muzzle-loading black powder antique firearm," ECF No. 48-2, at 3, constituted "use of . . . [f]irearms, including handguns, revolvers, pistols, rifles, shotguns, air guns, semiautomatic weapons and similar devices," ECF No. 48-1, at 52.

The complaint alleges that the "muzzle-loading black powder antique firearm" was "designed to use, and indeed did use, black powder" and was "not designed to use, and did not use, fixed ammunition." ECF No. 48-2, at 3. Salgado argues that "there are multiple reasonable dictionary and other definitions of the term 'firearm(s)' that would *not* reach the antique musket that is at issue in this case." Pl.'s Mem. 7 (emphasis in original). Salgado points to definitions of "firearm" as a device that shoots a projectile. For example:

> "[a] weapon, especially a pistol or rifle, capable of firing a projectile and using an explosive charge as a propellant."[6]

> "a small arms arm weapon, as a rifle or pistol, from which a projectile is fired by gunpowder."[7]

> "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive . . . ."[8]

*See* Pl.'s Mem. 7-8. According to Salgado, the fact that the device described in the complaint was "incapable of shooting any ammunition or projectile means it did *not* satisfy" the definition of firearms described above. *Id.* at 9. Salgado observes that "ammunition" means "[p]rojectiles, such as bullets and shot, together with their fuses and primers, that can be fired

---

[6] American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=firearm (last visited Sept. 29, 2025).

[7] Random House Unabridged Dictionary, https://www.dictionary.com/browse/firearm (last visited Sept. 29, 2025).

[8] 18 U.S.C. § 921(a)(3).

from guns or otherwise propelled,"[9] and other "objects that can be shot from a weapon, such as bullets or bombs."[10] In addition, a "projectile" is "[a] fired . . . or otherwise propelled object, such as a bullet."[11] *See* Pl.'s Reply 5 (providing definitions).

USLI responds that the state court complaint itself uses the word "firearm," which should definitively end the inquiry. Def.'s Opp. 5. USLI also observes that Salgado never actually alleged in the complaint that the device was "incapable of shooting any projectile or bullet" but instead alleged simply that the device was "not designed to use, and did not use, fixed ammunition." *Id.* at 5-6. Pointing to several dictionary definitions, USLI asserts that "muzzleloaders" are still "firearms" and observes that "fixed ammunition" is a subcategory of "ammunition" and thus a device not designed to use "fixed ammunition" is not necessarily incapable of using "ammunition." *Id.* at 6-7. USLI also asserts that the Exclusion covers bodily injury "arising from" firearms and it is not necessary for the complaint to allege that Salgado was injured by any bullet, ammunition, or other projectile. *Id.* at 7. At oral argument, USLI asserted the additional argument that the gunpowder expelled from the device was itself a "projectile" in that it was an "object" that was discharged.

I reject the view, not advanced in USLI's brief, that gunpowder is unambiguously a projectile. The American Heritage Dictionary's definition of "gunpowder" distinguishes powder from projectile within the definition of gunpowder. *See* American Heritage Dictionary

---

[9] *See* American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=ammunition (last visited Sept. 29, 2025).

[10] *See* Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/ammunition (last visited Sept. 29, 2025).

[11] *See* American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=projectile (last visited Sept. 29, 2025).

(defining "gunpowder" as "[a]ny of various explosive powders used to propel projectiles from guns, especially a black mixture of potassium nitrate, charcoal, and sulfur").[12] In addition, the Random House Unabridged Dictionary's definition of "firearm" distinguishes projectiles from gunpowder within the definition.[13]

However, I agree with USLI that the term "fixed ammunition" is narrower than "ammunition,"[14] and thus the complaint's allegation that the device was "not designed to use, and did not use, fixed ammunition" does not rule out the device being capable of using other forms of ammunition and being capable of shooting a projectile. But the fact that the complaint alleged that the device was a "muzzle-loading black powder antique firearm" that was "designed to use, and indeed did use, black powder" raises factual uncertainty about whether the antique device was indeed capable of firing a projectile. Given that there are multiple reasonable dictionary definitions of "firearm" that define that term as a device capable of firing a projectile, there is at a minimum legal uncertainty about whether a court would deem the Firearm Exclusion applicable to a device that could not in fact fire a projectile. Accordingly,

---

[12] American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=gunpowder (last visited Sept. 29, 2025).

[13] As noted, the Random House Unabridged Dictionary defines "firearm" as "a small arms arm weapon, as a rifle or pistol, from which a projectile is fired by gunpowder." Random House Unabridged Dictionary, https://www.dictionary.com/browse/firearm (last visited Sept. 29, 2025).

[14] *See* Merriam-Webster Dictionary (defining "fixed ammunition" as "ammunition in which the projectile is permanently attached to a case that contains the primer and the propellant in distinction from separate-loading ammunition"), https://www.merriam-webster.com/dictionary/fixed%20ammunition (last visited Sept. 29, 2025).

given the legal and factual uncertainty about the capabilities of the antique device, the Firearms Exclusion did not clearly and unambiguously exclude coverage.

### 3.    Use of "Fireworks" and "Similar Devices"

In its briefing, USLI also asserts that Subsection A.1.b of the Firearm Exclusion applies to exclude coverage. Def.'s Mem. 12. That subsection excludes coverage for injuries arising from "[f]ireworks, including firecrackers, Roman Candles, pinwheels skyrockets, ground displays, flares, smoke bombs and similar devices that produce, when ignited or activated, sound, smoke, motion or a combination of these." ECF No. 48-1, at 52. According to USLI, "it is entirely within the common experience of any individual to conclude that the ignition of a black powder firearm in this (or any) case produced sound, smoke, motion, or a combination of these, all of which brought about injury to the Plaintiff." Def.'s Mem. 12. However, as USLI acknowledges, the underlying complaint does not state whether there was "sound", "smoke", or "motion" when the device was discharged. *Id.* Moreover, as Salgado stresses, well-accepted definitions of "firework" are inapplicable to the device at issue in this case.[15] Pl.'s Mem. 15. I conclude that, at the very least, it is ambiguous whether the device at issue in this case met the

---

[15] *See* American Heritage Dictionary (defining "firework" as "[a] device consisting of a combination of explosives and combustibles, set off to generate colored lights, smoke, and noise for amusement"), https://ahdictionary.com/word/search.html?q=firework (last visited Sept. 29, 2025); Random House Unabridged Dictionary (defining "firework" as "a combustible or explosive device for producing a striking display of light or a loud noise, used for signaling or as part of a celebration"), https://www.dictionary.com/browse/firework (last visited Sept. 29, 2025).

definition of "firework" or a "similar device" that "when ignited or activated, sound, smoke, motion or a combination of these."[16] *Id.*

### C.    Battery Exclusion

USLI also asserts that it was under no obligation to defend the defendants in the underlying state court case because the allegations in the complaint unambiguously fell within the Policy's Battery Exclusion. Def.'s Mem. 13-16. That provision states that the Policy does not apply to "any claim, demand or 'suit' based upon any actual or alleged 'assault' or 'battery'" or "any claim, demand or 'suit' in which the underlying operative facts constitute 'assault' or 'battery.'" ECF No. 48-1, at 44. The policy defines "Battery" as "negligent or

---

[16] Salgado argues that the Firearms Exclusion "is also ambiguous in that it uses the plural—and *only* the plural—formulation for the words 'firearms' and 'fireworks.'" Pl.'s Mem. 18. Salgado observes that the court in *AIX Specialty Insurance Company v. Everett*, 543 F. Supp. 3d 1321 (M.D. Fla. 2021), considered a firearms exclusion that provided: "It is understood that no coverage is afforded by this policy for any injury, death, claims, or actions occasioned directly or indirectly or as an incident to the discharge of firearms by person or persons on or about the insured premises." In that case, the court determined that "[b]y its plain meaning, this exclusion applies only to the discharge of *firearms* by a person and the discharge of *firearms* by persons." *Id.* (emphasis added). On appeal, because the insurance company had failed to brief the issue, the Eleventh Circuit left this aspect of the district court's decision undisturbed. No. 21-12386, 2022 WL 950936, at *3 (11th Cir. 2022). Salgado asserts that that this case creates legal uncertainty that triggered the duty to defend under *Nash Street* as "when there is a split of authority in other jurisdictions as to the meaning of a particular policy provision, and no appellate authority in the relevant jurisdiction has opined on the matter, the uncertainty as to how a court might interpret the policy gives rise to the duty to defend." *Nash Street*, 337 Conn. at 11; *see also Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 n.11 (2d Cir. 2001) (stating that the existence of a district court decision conflicting with other decisions "rendered *uncertain* the question of whether the courts would deem the term" at issue in the policy "to be unambiguous") (emphasis in original). USLI responds by citing decisions from other courts concluding that the use of the plural term "firearms" in an exclusion does not limit the exclusion to injuries resulting from multiple firearms. Def.'s Mem. 10-11. I need not reach this issue because I conclude that there is uncertainty on other grounds about whether courts would deem the Firearms Exclusion applicable to the allegations in the complaint.

intentional physical contact with another without consent that results in physical or emotional injury." *Id.*

USLI argues that the underlying complaint alleges that Salgado was "struck" by black powder as a result of Sanchez's negligence and thus the Policy clearly excludes coverage. Def.'s Mem. 17-18. Salgado responds that the definition of battery in the Policy does not unambiguously apply to the conduct alleged in the complaint because "physical contact" could be reasonably understood to require body-to-body contact. Salgado points to the Cambridge Dictionary's definition of "physical contact" as meaning "the fact of someone's body touching someone else" and observes that "physical" means "of or relating to the body." Pl.'s Mem. 21 (quoting Cambridge Dictionary).[17] According to Salgado, these definitions show the duty to defend was triggered because there is "at a minimum" "uncertainty or ambiguity" as to whether a court would apply the Battery Exclusion to the allegations presented in the underlying complaint. *Id.* In addition, Salgado asserts that reading the Battery Exclusion to include any indirect injury caused by negligence would lead to unexpected results—such as the denial of coverage if a poorly secured drum rolled down a hill during the parade and injured a spectator. Pl.'s Mem. 24.

I agree that there is legal uncertainty about whether the definition of "battery" in the Battery Exclusion would apply to the allegations in the underlying complaint. When asked about the scope of the Battery Exclusion at oral argument, counsel for USLI stated that someone intentionally setting in motion an object that strikes someone else would constitute battery under the Exclusion's definition whereas someone accidentally setting in motion

---

[17] *See* Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/physical-contact (last visited Sept. 29, 2025).

something would not be battery. Notably, however, the underlying complaint in this case does *not* allege that Sanchez intentionally discharged the device.

In addition, I agree with Salgado that the Exclusion could be read to require body-to-body contact, and the complaint contains no allegation that Sanchez touched his body to Salgado's body. USLI points to the definition of battery contained in the Restatement (Second) of Torts, asserting that the Restatement's definition makes clear that body-to-body contact is not required for battery. *See* Def.'s Mem. 17; Def.'s Opp. 15. The Restatement provides:

> (1) An actor is subject to liability to another for battery if
>
> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>
> (b) an offensive contact with the person of the other directly or indirectly results.
>
> (2) An act which is not done with the intention stated in Subsection (1, a) does not make the actor liable to the other for a mere offensive contact with the other's person although the act involves an unreasonable risk of inflicting it and, therefore, would be negligent or reckless if the risk threatened bodily harm.

Restatement (Second) of Torts § 18 (Am. L. Inst. 1965). The commentary to the provision provides in part:

> *Meaning of "contact with another's person."* In order to make the actor liable under the rule stated in this Section, it is not necessary that he should bring any part of his own body in contact with another's person. It is enough that he intentionally cause his clothing or anything held or attached to him to come into such contact. So too, he is liable under the rule stated in this Section if he throws a substance, such as water, upon the other or if he sets a dog upon him. It is not necessary that the contact with the other's person be directly caused by some act of the actor. All that is necessary is that the actor intend to cause the other, directly or indirectly, to come in contact with a foreign substance in a manner which the other will reasonably regard as offensive. . . .

*Id*.

However, the Battery Exclusion's definition of battery does not use the same language as the Restatement's definition of battery. Instead, the two definitions differ in significant ways. First, the Restatement requires that someone acts *intending* to cause "a harmful or offense contact with the person of the other or a third person," *id.* § 18(1)(a), whereas the Battery Exclusion purports to cover "negligent" conduct, ECF No. 48-1, at 44. Second, the Restatement requires that "an offensive contact with the person of the other directly or indirectly results," Restatement (Second) of Torts § 18(1)(b), whereas the Battery Exclusion instead requires "physical contact with another without consent that results in physical or emotional injury," ECF No. 48-1, at 44. Thus, the Restatement's definition does not reference the actor's own body, focusing instead on the "person" of the victim and requiring only that the contact be "offensive." In contrast, the Battery Exclusion requires "physical contact with another" thus at least arguably implying that the bodies of *both* the actor and the other person must touch. *See* Cambridge Dictionary (defining "physical contact" as "the fact of someone's body touching someone else").[18] Finally, whereas the Restatement allows for the offensive contact with the victim to result "directly or indirectly," Restatement (Second) of Torts § 18(1)(b), the Battery Exclusion contains no such allowance. The Restatement therefore specifically provides that the offensive contact with the other person's body can occur indirectly—i.e., through some object or other medium. A court analyzing the scope of the Battery Exclusion might well find it significant that the Exclusion's definition of battery does

---

[18] *See* Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/physical-contact (last visited Sept. 29, 2025).

not specify that "indirect" contact is included—a departure from the Restatement's explicit inclusion of indirect contact.[19]

To support its argument that body-to-body contact is not required, USLI relies on *Mount Vernon Fire Ins. Corp. v. Oxnard Hosp. Enter., Inc*., 219 Cal. App. 4th 876, 880 (2013), where an insurance company sought a declaratory judgment that it had no duty to indemnify a nightclub or pay a claim arising from an incident where a patron injured a nightclub dancer. *Id.* at 878-79. The policy at issue contained a battery exclusion that defined battery identically to the battery definition in the instant case. *See id.* at 879. The California Court of Appeals, Second District, rejected the argument that "physical contact" required "a direct 'body-to-body' contact." Instead, the court concluded that the definition extended to "the intentional attack" made on the dancer and "includes a striking or touching as occurred in this case." *Id.* at 878. The court reasoned: "Had [the] assailant struck [the dancer] with a closed fist, there could be no argument that such a striking was not a 'battery' under [the] policy. Could the answer be any different if that fist contained a glass container that was used to strike [the dancer]? . . . How, then, could or should the result be any different if the glass container were filled, as in this case, with a flammable substance used to set [the dancer] afire?" *Id.* at 882-83.

Salgado argues that the facts of *Mount Vernon* differ because there the victim was struck by a person holding an object. Pl.'s Mem. 22-23. Here, the state court complaint

---

[19] USLI points to *Denny v. Town of Hamden Bd. of Educ*., No. CV146047401, 2015 WL 1589084 (Conn. Super. Ct. Mar. 16, 2015), where the court referenced the Restatement's commentary in concluding that the plaintiff had adequately alleged battery under Connecticut law by "specifically alleging that [the defendant] ordered [the child] to clean up urine in the boys' restroom under medically hazardous conditions." *Id.* at *2-3. However, the definition of battery in Connecticut differs from the definition of battery in the Battery Exclusion.

contains no allegation that Sanchez struck Salgado directly with any object he was holding in his hand, or which was otherwise connected to his body. Instead, the allegation is that "black powder" struck Salgado after Sanchez discharged the antique device. ECF No. 48-2 at 3. In addition, unlike in the present case, the act causing the injury in *Mount Vernon* was plainly intentional. *Mount Vernon Fire Ins. Corp.*, 219 Cal. App. 4th at 882 (concluding that "the policy's definition of battery extends to the intentional attack made on [the victim]"). Here, the complaint contains no allegation that Sanchez intentionally set in motion the black powder from the device. Indeed, the allegations in the complaint are consistent with an accidental discharge. As noted, at oral argument, USLI stated that the Exclusion's definition of battery requires an *intention* by the actor to set in motion an object that caused the injury. But that required intention is not set forth in the complaint. Accordingly, even under USLI's own definition of battery as set forth at oral argument, the Exclusion does not reach conduct that is consistent with the complaint's allegations.

Under Connecticut law, my task is not to determine conclusively what the Battery Exclusion means—as was the task of the court in *Mount Vernon Fire Ins. Corp.* Rather, I must determine if there was "any *possibility* of coverage" based on the allegations in the underlying complaint. *Nash St., LLC*, 337 Conn. at 10. In making that determination, I must consider Connecticut law stating that when "construing exclusion clauses, the language should be construed in favor of the insured unless [the court] has a high degree of certainty that the policy language clearly and unambiguously excludes the claim." *Nationwide Mutual Ins. Co.*, 327 Conn. at 239 (internal quotation marks omitted). Exclusions in insurance policies must be clearly stated and provide fair notice to a lay person about the types of conduct excluded by the otherwise applicable policy. *See Allstate Ins. Co.*, 342 Conn. at 299 (stating that "we are

mindful of the principle that provisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view") (internal quotation marks omitted).

The definition of battery in the Battery Exclusion is not drawn from the Restatement or from any jurisdiction that USLI identifies. Pl.'s Reply 10. The explanation of the scope of the provision as described by USLI at oral argument is narrower than the allegations regarding Sanchez's conduct in underlying complaint. A lay person reading the Policy would not reasonably expect for a battery exclusion to cover not only unintentional conduct but also injuries that result indirectly through the negligent interaction with devices or other objects. There is at a minimum ambiguity about the reach of the Battery Exclusion to injuries that do not result from body-to-body contact and result indirectly from conduct where the actor had no intention to set in motion an object or substance that ultimately causes injury. For these reasons, there was legal uncertainly about the applicability of the Battery Exclusion and USLI breached its duty by failing to defend Rodriguez.

## IV.   <u>CONCLUSION</u>

For these reasons, I conclude that USLI breached its duty to defend. Plaintiff's Motion for Summary Judgment on the duty to defend is **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**.

I will convene a status conference to determine next steps in this case.

SO ORDERED.

New Haven, Connecticut
September 29, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge